Arthur Graf and Rose Graf v. Commissioner.
Graf v. Commissioner
Docket No. 6632-66.
United States Tax Court
T.C. Memo 1969-61; 1969 Tax Ct. Memo LEXIS 233; 28 T.C.M. (CCH) 355; T.C.M. (RIA) 69061; March 31, 1969, Filed Abraham M. Stanger, for the petitioners. Agatha L. Vorsanger, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency in petitioners' 1961 income tax in the amount of $3,137.85. The issue is whether $23,500 received by petitioners in 1961 constituted proceeds from the sale of stock. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Arthur Graf, who will be called petitioner (in some of the documents the name is spelled Graff), and Rose Graf are husband and wife whose legal residence at the time they filed the petition in this proceeding was New York, N. Y. They filed their joint Federal income tax return for the year 1961 with the district director of internal revenue, Brooklyn, New York. Jet Industries *234 Corporation was organized in 1950 under the laws of the State of New York. It was engaged in manufacturing zippers or zipper parts. It had outstanding and issued 20 shares of stock. Petitioner owned 10 shares of that stock at a cost to him of $1,000. The remaining shares were owned by Isidor Stern. A related corporation, Rapid Products Corporation, whose stock was owned by Isidor Stern, purchased all of the output of Jet. From its inception, petitioner was president of Jet. His duties consisted mainly in running the factory and building machines. Petitioner was paid a salary on a weekly basis. His starting salary was $165 per week. This was increased to $200 per week after approximately two years, and sometime later he received between $250 and $300 per week. Sol Wang was the accountant of Jet since its inception and he has continued in that capacity since that time. In the spring of 1959, a strike developed at Jet and Isidor Stern informed petitioner from this point forward no more salaries would be paid. Petitioner left Jet and some months later he went to work for the Sly Zipper Corporation. In March of 1960 petitioner caused an action to be instituted against Isidor Stern *235 and Sol Wang. The complaint in this action, which was filed in the Supreme Court, New York County, named Jet Industries Corp. as co-plaintiff with petitioner. The complaint alleged six causes of action which claimed in the first cause in paragraphs 1 through 4 that defendants had conspired and acted in such a manner "as to deprive the plaintiff and JET INDUSTRIES CORP. of profits from the operation of the business" and as a result "the plaintiff has been damaged in the sum of three million, four hundred twenty thousand dollars ($3,420,000)." In the next four causes of action in the complaint, the first lines state: "Plaintiff repeats and reiterates paragraphs one through four of this complaint." Each of these causes of action goes on to allege various other alleged acts of the defendants Stern and Wang that resulted in damages such as diversion of profits, or unauthorized corporate expenditures, or failure to pay petitioner for development work, or failure to turn over proceeds defendants received from sales of corporate property. The sixth cause of action sought a receiver for Jet Industries Corporation. The prayer of the complaint demanded judgments against the defendants Stern and *236 Wang on the first, second, third, fourth, and fifth causes of action in the amounts of $3,420,000, $3,000,000 $120,000, $250,000, and $50,000, respectively, plus costs and interest. It is stipulated that in January 1961 a settlement was reached in the above action. Petitioner, Stern and Jet entered into two 356 agreements identified in the record as Exhibits "D" and "E" which it is stipulated were "executed in connection with the settlement entered into by petitioner, Arthur Graf, Isidor Stern and Jet Industries Corp. The following is a copy of the two agreements: EXHIBIT "D" THIS AGREEMENT made in the City of New York, State of New York, on January , 1961, between ARTHUR GRAFF, residing at (herein called "Graff") and ISIDOR STERN, residing at (herein called "Stern") and JET INDUSTRIES CORP., a corporation duly created, organized and existing under, and by virtue of, the laws of the State of New York, and having its principal office at No. Borough of Brooklyn, City of New York (herein called "Jet"). WITNESSETH: WHEREAS, Jet is duly organized under the laws of the State of New York, and has authorized and issued capital stock consisting of twenty (20) shares each having *237 no par value, all fully paid and nonassessable; and WHEREAS, Graff and Stern are each owners of half of the entire capital stock of Jet, each having ten (10) shares of said stock; and WHEREAS, Stern is desirous of purchasing from Graff the ten (10) shares of capital stock of Jet owned by Graff: NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: 1. That Graff hereby sells to Stern and Stern hereby purchases from Graff, ten (10) shares of the capital stock of Jet, together with all dividends, incomes and issues therefrom, and all rights of preemption, if any, for the sum of Twenty-five Hundred ($2500) Dollars. 2. (a) That Graff shall endorse in blank the capital stock, and shall deliver the same to Stern simultaneously with the execution of this agreement, and Stern shall, upon receipt thereof, pay Graff the said sum of Twenty-five Hundred ($2500) Dollars by a good certified check drawn to the order of Graff. (b) That simultaneously with the execution of this agreement Graff shall execute and deliver to Stern his written resignation as President and Director of Jet. 3. (a) That Stern and Jet warrant that all taxes, federal, state and municipal, have been duly paid by Jet; *238 that all reports required by law have been duly filed by Jet. (b) That Jet and Stern assume all obligations of Jet which now exist or which may arise in the future and Stern undertakes to save Graff harmless from any obligation or liability which may arise because of such corporate obligation, by reason of any matter, cause, thing or transaction, whatsoever initiated or had prior to the date hereof or subsequent thereto, including all pending litigation. 4. That by virtue of this sale of stock, Graff hereby transfers all of his right, title and interest in and to Jet or any monies or assets due Jet and Graff shall not at any future time, either directly or indirectly conduct or be interested in or associated in any business conducted under the name of Jet Industries Corp., or any other name so nearly resembling the same as may be calculated to mislead or deceive or to represent that he is still associated with Jet. 5. Graff shall have the right to obtain employment in any industry or operate any business. Graff shall not disclose any of Jet's or Stern's customers or prices. 6. That this agreement shall bind the parties hereto, and their heirs, executors, successors and assigns, *239 respectively. IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written. JET INDUSTRIES CORP. BY: /s/ Isidor Stern Isidor Stern /s/ Arthur Graff Arthur Graff /s/ Isidor Stern Isidor Stern EXHIBIT "E" THIS AGREEMENT made in the City of New York, State of New York on December 1st, 1960, by and between ARTHUR GRAFF, residing at (herein called "Graff") and ISIDOR STERN, residing at (herein called "Stern") and JET INDUSTRIES CORP. a corporation duly created, organized and existing under, and by virtue of, the laws of the State of New York, and having its principal office at No. Borough of Brooklyn, City of New York (herein called "Jet"). WITNESSETH: WHEREAS, Arthur Graff and Jet Industries Corp. instituted an action against Isidor Stern and Sol Wang; and 357 WHEREAS, Stern, doing business under the firm name and style of Rapid Products Co., has agreed to return to Jet the sum of one penny for each yard of goods sold and delivered by Jet to Rapid Products Co. for the year 1959; and WHEREAS, Graff was employed by Jet in charge of production and manufacturing until June of 1959; and WHEREAS, said *240 Graff has acted as a consultant to Jet since that time and has not been compensated therefor: NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: 1. The agreement of employment between Jet and Graff hereby is cancelled without further liability to either party as against the other. 2. That Graff hereby acknowledges the receipt from Jet of the sum of Twenty-two Thousand Five Hundred ($22,500) Dollars in full payment of all services performed by Graff as consultant since June of 1959 for Jet. 3. That Graff will pay all taxes due on account of the compensation provided herein covering his services as consultant to Jet for the period since June, 1959 to date. 4. That Stern agrees that he will indemnify Graff for any liability to creditors as a result of the payment by Jet to Graff and warrants that Jet has a sufficient surplus to cover these payments. 5. That Graff hereby assigns any and all improvements and inventions that he made during the term of his employment, to wit, June of 1959, other than those which he has already assigned to Jet and/or Stern, provided that said inventions are patentable. 6. That each party hereby releases and forever discharges the other party from *241 all monies, claims, demands, contracts and actions whatsoever up to and including the date hereof. IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written. JET INDUSTRIES CORP. By: /s/ Isidor Stern Isidor Stern /s/ Arthur Graff Arthur Graff /s/ Isidor Stern Isidor Stern It is stipulated that petitioner received the following three checks as a result of the settlement of the action he and Jet had instituted against Stern and Wang: Check of Jet Industries Corp. dated De- cember 23, 1960, in the amount of
$22,500
Check of Jet Industries Corp. dated De- cember 23, 1960, in the amount of
1,000
Check of Isidor Stern Co. dated Jan. 20, 1961, in the amount of
2,500
The two checks for $2,500 and $1,000, respectively, were made out to petitioner but the check for $22,500 was made out to "Arthur Graf and Abraham Wax." Abraham Wax was petitioner's counsel in the suit and he represented petitioner in the settlement negotiations and the agreements executed in connection therewith. The check for $22,500 was delivered to petitioner's counsel and he deposited it in his special account and thereafter *242 $15,971 was remitted to petitioner after $6,529 was deducted by petitioner's counsel from the $22,500 for all legal fees and disbursements. Petitioner resigned in early 1961 as president of Jet pursuant to the agreement dated in January 1961. Petitioner reported only the aggregate proceeds of $26,000 on his 1961 joint return. He treated this amount as proceeds from the sale of his stock in Jet, less his cost basis of $1,000 and attorney's fee of $6,529 for a net gain of $18,471 which he treated for tax purposes as a long-term capital gain of $9,235.50. The Commissioner determined that $2,500 was proceeds from the sale of stock in Jet and that $22,500 was ordinary income from compensation, wages or salaries paid to petitioner by Jet and $1,000 represented other income. Respondent's computation of deficiency allocated and allowed as deductions $5,904 of the $6,529 attorney fee expenses to the $22,500 ordinary income and the balance or $625 to the sale of stock for $2,500. Opinion We have some difficulty in understanding petitioner's position. As we have stated, petitioner, on his 1961 return, treated the entire $26,000 as proceeds from the sale of his Jet stock. In his petition *243 filed in this case he alleges: "Petitioners claim that the total proceeds of $26,000.00 arose from the sale of this stock which was a capital asset as defined by § 1221 of the Internal Revenue Code (1954)." He alleges that the Commissioner erred in classifying $22,500 of said proceeds as ordinary income as wages or salary paid to petitioner and erred in not allowing the $1,000 payment as part of the proceeds of the sale of stock. 358 Petitioner had the burden to prove that the two payments totalling $23,500 were made to him as part of the purchase price for the stock. Respondent had no burden to show that any portion of the payments constituted compensation for services. He had a right to call the $22,500 compensation for services in his deficiency notice for petitioner called it that in his agreement, identified as Exhibit "E". But if petitioner proved it was not compensation for services it would still be ordinary income unless petitioner established it was proceeds from the sale of stock. There is no testimony by anyone, including the petitioner, that the $23,500 was paid to him for stock. There is no testimony by petitioner that he even consider *244 the $22,500 payment and the $1,000 payment as payments for his stock. He testified he considered the payment of $22,500 under Exhibit "E" as part of the payment made to him to settle his suit against Stern. He gave no testimony at all about the $1,000 payment except that he said the entire payment of $26,000 was in settlement of the suit. Exhibit "D" and the $2,500 check from Stern to petitioner constitute the only evidence there is in this record with respect to the portion of the total settlement of $26,000 that is to be allocated to the stock sale. There is not a word of testimony by petitioner or any one that Exhibit "D" did not recite the true agreement between the parties. Petitioner testified he did no work for Jet after he left in June of 1959. He contends his testimony shows that the statements in the agreement, Exhibit "E", to the effect that he acted as consultant for Jet during said period and was being paid $22,500 in full payment for services performed as consultant since June of 1959, were erroneous. His argument goes on to contend that if it is established he did no work for Jet as recited in Exhibit "E" then it follows that the $23,500 in some unexplained manner *245 becomes proceeds from the sale of stock. Little need be said in answer to petitioner's argument. Exhibit "E" shows the payment of $22,500 was in settlement of his suit. Petitioner testified this payment was in settlement of his suit. The fact that it was being made by Jet and was being labeled compensation might be of interest in a tax case with Jet involving salary deductions. It is of no interest on the issue in this case. The fact, if it be a fact, that the payment was wrongly labeled compensation, would not make it proceeds from the sale of stock. Petitioner disputes the fact that his suit sought compensation to be paid to him. He states on brief the lawsuit "was in the nature of corporate waste and diversion of corporate opportunity." And at another place he states the nature of claims pressed in the litigation "was not litigation wherein Graf sought compensation" and at another place he states "the gravamen of the actions there was for corporate waste and diversion of corporate profits. Any recovery would have inured to the corporation." Again this argument leads nowhere. Petitioner testified the money was paid to him in settlement of this suit. We think he is wrong in *246 his contention as to the nature of the suit for it sought compensatory recovery for petitioner's alleged losses. It certainly sought money judgments in favor of petitioner and against Stern for the alleged wrongful actions of Stern that resulted in damaging petitioner. But if the nature of the suit was as petitioner contends the amount paid in settlement would not be accorded capital gains treatment. Petitioner does not exactly argue that it would. His argument seems to be that if the money was paid for settlement of the suit and the suit was not for compensation in the nature of services performed for the corporation then the settlement sum must be considered proceeds from the sale of stock. We recognize this as part of the same argument mentioned earlier that if he establishes the money was not compensation for services performed it becomes proceeds from the sale of stock. It would be pointless to pursue petitioner's argument further. This case is not at all like Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957) or Schulz v. Commissioner, 294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960), *247 cited by petitioner. Those cases involved the amount of the purchase price of a business that could be allocated to goodwill and covenants not to compete. Here there was a sale of stock and, in a separate agreement, a sum paid in settlement of a lawsuit. The cited cases would be no authority for holding the sum admittedly received in settlement of the lawsuit should be allocated to the stock purchase. 359 We hold petitioner did not sustain his burden of showing any portion of the $23,500 was proceeds from the sale of stock. We sustain respondent's determination that the $23,500 constituted ordinary income. Although respondent's allocation of the expenses, $5,904, to the payment under Agreement "E" and $625 to the payment under Agreement "D" is mentioned in the petition the allegation does not seem to assert error if the $26,000 is not all considered capital gain. At any rate, petitioner presents no argument with respect to this adjustment in the deficiency computation, so we sustain it. Since there is a medical deduction issue that will be ruled by our holding, Decision will be entered under Rule 50.